DENNY v. DODSON.

(*Circuit Court, D. Oregon.* November 28, 1887.)

1. PUBLIC LANDS—RAILROAD GRANT—NORTHERN PACIFIC—EFFECT OF.
   The congressional grant of the odd-numbered sections of the public land on the line of the Northern Pacific Railway to that corporation is a present one, and passes the legal title to the grantee; but the corporation is not authorized to dispose of or incumber the land without the consent of congress, except the earned portions lying opposite to any 25-mile section of the road, after the construction thereof, and the acceptance of the same by the United States.

2. SAME.
   No entry could be made of any land in an odd numbered section within the limits of the grant, under the town-site, homestead, or pre-emption act after August 13, 1870, when the railway company filed its map of general route with the secretary of the interior, in the office of the commissioner of the general land-office.

3. SAME.
   The location of the line of the road in a state or territory determines the width of the grant,—whether of 10 or 20 alternate sections,—without reference to the fact of whether the grant includes lands within the limits of a state or not.

4. SAME.
   The condition attached to the grant to the railway company, that the road shall be completed by a day named, is a condition subsequent, for a breach of which no one but the government, the grantor, can claim a forfeiture; and the title of the company, though defeasible in the mean time, is still the legal one, on which it may maintain ejectment against any intruder or trespasser.

Action to Recover Possession of Real Property.

This is an action of ejectment to recover possession of certain lots in the town of Arlington, Gilliam county, Oregon, being portions of section

21, in township 3 N., of range 21 E. of the Willamette meridian, in that state.

The plaintiff claims title to them under the grant made to the Northern Pacific Railroad Company, by the act of congress of July 2, 1864. The complaint alleges that he is the owner in fee of the premises; that the defendant is in possession thereof, and wrongfully withholds the possession from him to his damage of $200. In order to show that the action arises under a law of the United States, so as to bring it within the jurisdiction of the circuit court, the complaint refers to the act of July 2, 1864, "granting lands to aid in the construction of a railroad and telegraph line from Lake Superior to Puget sound, on the Pacific coast, by the northern route," and to acts and joint resolutions supplementary thereto and amendatory thereof, and alleges that the plaintiff derives title to the lands in controversy, and holds them under those acts and resolutions, and by a deed from the Northern Pacific Railroad Company. The complaint then sets forth, that, under these acts and resolutions, there was granted to that company, its successors and assigns, for the purpose of aiding in the construction of the railroad and telegraph line mentioned, every alternate section of public land designated by odd numbers, to the amount of 20 alternate sections per mile, on each side of the railroad line, as the same should be adopted by the company, through the territories of the United States; that the general route of the railroad through the territory of Washington, and opposite to the premises in controversy, which are within the boundary of the grant, was fixed by the company, on or about the thirteenth day of August, 1870, and a map and plat thereof were, on that day, filed with the secretary of the interior, in the office of the commissioner of the general land-office; that thereupon all lands included within the grant opposite to the general route of the road, as thus fixed, including the lands in controversy, were, by order duly made and promulgated, withdrawn from sale, entry, and pre-emption, as in the act provided, and that this order has ever since been and now is in full force and effect; that on the twenty-ninth day of June, 1883, the line of the road was definitely fixed and located through the territory of Washington, opposite to the premises, and a map, showing the definite location of the line of the road, was on that day filed with the secretary of the interior, in the office of the commissioner of the general land-office; that the road was fully constructed on the line thus definitely located by the company, opposite to the premises, on or about the twenty-first day of December, 1884, and that the same was approved and accepted by the president of the United States on the seventeenth day of January, 1885; that the company has duly selected the premises in controversy, in accordance with the regulations of the department of the interior, and has paid to the government the cost of surveying the same; that on said thirteenth day of August, 1870, upon the withdrawal of the lands within the grant, as mentioned, the premises in controversy were public lands, not mineral, and not reserved, sold, granted, or occupied by homestead or other settlers, nor otherwise disposed of or located upon, and were free from pre-emption or other claims

or rights, and to them the United States had full title, not appropriated otherwise than by the said act of congress, and the acts and joint resolutions supplemental thereto and amendatory thereof; and that said lands thenceforth were reserved to, and thereupon became the property of the Northern Pacific Railroad Company; that on or about the third day of December, 1885, the company, for a valuable consideration, conveyed the premises to the plaintiff, who has since been and now is the owner, seized in fee and entitled to the possession thereof. The complaint concludes with a prayer that the plaintiff have judgment against the defendant for the possession of the premises, and for the sum of $200 damages for wrongfully withholding the possession from him. To the complaint the defendant demurred, upon the ground that it did not state a sufficient cause of action; and upon this demurrer the cause was heard.

*Cyrus A. Dolph* and *Ralph M. Dement,* for plaintiff.

*Alfred S. Bennett* and *J. Q. Adams,* for defendant.

Before FIELD, circuit justice, and DEADY, district judge.

FIELD, Circuit Justice. As the complaint avers that the premises in controversy were a part of the land granted to the Northern Pacific Railroad Company by the act of congress of July 2, 1864, and that they were free from any claims which would defeat their vesting in the company, at the time the general route of its railroad was designated, and a map thereof filed with the commissioner of the general land-office, and the lands opposite to such route were withdrawn from sale, entry, and preemption, the only objections that can be raised upon the demurrer must go to the sufficiency of the title granted to maintain ejectment, or to the omission of the complaint to aver that the lands were as free from any other claims when the route became definitely fixed as when the general route was designated, and a map thereof filed; and such is the purport of the argument of the defendant.

As to the title, his contention is that the grant contained in the act of July 2, 1864, "was not a grant of title *in præsenti,* but only of an inchoate interest" in the lands described; that the building of each 25-mile section was, by the terms of the act, a condition precedent to the vesting of title to lands coterminous to such section; and that, upon the failure of the company to complete the entire road within the time designated in the act, the title to all lands not then earned remained in the United States, and could not pass to the company without affirmative action on the part of congress. By "an inchoate interest," as here used, is probably meant an interest which might afterwards be enlarged into a title as the construction of the road proceeded. To determine the weight of these objections, a careful examination of the language and object of the act of July 2, 1864, is necessary. 13 St. *c.* 217, p. 365.

By the first section the Northern Pacific Railroad Company was incorporated, and authorized to lay out, construct, and maintain a continuous railroad, and telegraph line, with the appurtenances, from a point on Lake Superior, in the state of Minnesota or Wisconsin, and thence westerly by the most eligible route, as should be determined by the com-

pany, within the territory of the United States, on a line north of the forty-fifth degree of latitude, to some point on Puget sound, with a branch by the valley of the Columbia river to a point at or near Portland, in the state of Oregon. The company was also invested with all the powers, privileges, and immunities necessary to carry into effect the purposes of the act.

By the third section a grant of land was made to the company. Its language is:

"*That there be, and hereby is, granted* to the Northern Pacific Railroad Company, its successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific coast, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores over the route of said line of railway, every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile on each side of said railroad line, as said company may adopt, through the territories of the United States, and ten alternate sections of land per mile on each side of said railroad wherever it passes through any state, and wherever on the line thereof the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights at the time the line of said road is definitely fixed and a plat thereof filed in the office of the commissioner of the general land-office. And whenever prior to said time any of said sections or parts of sections shall have been granted, sold, reserved, occupied by homestead settlers, or pre-empted or otherwise disposed of, other lands shall be selected by said company in lieu thereof, under the direction of the secretary of the interior, in alternate sections and designated by odd numbers, not more than ten miles beyond the limits of said alternate sections."

By the fourth section it was enacted:

"That whenever said Northern Pacific Railroad Company shall have twenty-five consecutive miles of any portion of said railroad and telegraph line ready for the service contemplated, the president of the United States shall appoint three commissioners to examine the same, and if it shall appear that twenty-five consecutive miles of said road and telegraph line have been completed in a good, substantial, and workmanlike manner, as in all other respects required by this act, the commissioners shall so report to the president of the United States, and patents of lands, as aforesaid, shall be issued to said company, *confirming to said company the right and title to said lands,* situated opposite to and coterminous with said completed section of said road; and from time to time, whenever twenty-five additional consecutive miles shall have been constructed, completed, and in readiness as aforesaid, and verified by said commissioners to the president of the United States, then patents shall be issued to said company, conveying the additional sections of land as aforesaid."

By the sixth section it was enacted:

"That the president of the United States shall cause the lands to be surveyed for forty miles in width on both sides of the entire line of said road, *after the general route shall be fixed,* and as fast as may be required by the construction of said railroad; and the odd sections of land hereby granted shall not be liable to sale or entry, or pre-emption, before or after they are surveyed except by said company, as provided in this act; but the provisions of the act of September, 1841, granting pre-emption rights, and the acts amendatory thereof, and of the act entitled 'An act to secure homesteads to actual settlers on the public domain,' approved May 20, 1862, shall be, and

the same are hereby, extended to all other lands, on the line of said road, when surveyed, excepting those hereby granted to said company."

The act also declared that the grants were made, and the rights and privileges were conferred upon and accepted by the company, on the condition that it should commence work on the road within two years from the approval of the act by the president, and complete and equip the whole road by the fourth of July, 1876; and upon the further condition that, if the company should make any breach of the conditions of the grants, and allow the same to continue for upwards of one year, then at any time thereafter the United States might "do any and all acts and things" needful and necessary to insure a speedy completion of the road. By a subsequent act, the time for the commencement of the road was extended to July 2, 1868, and for its completion to July 4, 1878. 14 St. 355.

The terms in which the land is granted do not support the contention of the defendant. They import the transfer of a present title, and not one to arise in the future. They are "that there be, and hereby is, granted" to the company every alternate section of the lands designated. There is nothing in them to indicate that only a partial or limited interest is intended. The lands themselves, described by the sections named, are granted; and, of course, whatever interest the United States possessed in such lands passed, unless the import of the terms be qualified by subsequent provisions of the act; and whether such is the case we shall presently consider. Similar terms are employed in a large number of congressional grants of land, and notably so in those made to aid in the construction of railroads. They have been considered by the supreme court in many instances, and in all of them have received the same interpretation; which is that unless restricted by other clauses of the act, they import a grant *in præsenti*, conveying at once the interest of the United States to the lands described, whatever that may be.

As the sections granted are to be along the line of the railroad, they cannot be located until the line of the road is fixed. The grant is therefore in the nature of a float; and the title does not become definitely attached to specific sections until they are capable of identification. But when they are once identified, the title attaches as of the date of the grant, except as to such parcels as in the mean time by the terms of the act have been otherwise appropriated. It is in this sense that the grant is termed a grant *in præsenti*. The cases of *Schulenberg* v. *Harriman*, 21 Wall. 44, 65; *Railroad Co.* v. *U. S.*, 92 U. S. 733; *Railway Co.* v. *Railway Co.*, 97 U. S. 491; and *Railroad Co.* v. *Baldwin*, 103 U. S. 426,—— may be examined for further illustration of this subject, and the construction by the supreme court of similar terms of grant. In the *Leavenworth Case*, that court said:

" ' There be and is hereby granted' are words of absolute donation, and import a grant *in præsenti*. This court has held that they can have no other meaning, and the land department, on this interpretation of them, has uniformly administered every previous similar grant. They vest a present title in the state of Kansas, [the grantee named,] though a survey of the lands and

a location of the road are necessary to give precision to it and attach it to any particular tract. The grant then becomes certain, and by relation has the same effect upon the selected parcels, as if it had specifically described them." 92 U. S. 741.

The *present title* here mentioned is a legal title, as distinguished from an equitable or inchoate interest arising upon a contract or promise of the government. The words "there be and is hereby granted" are not words of contract or promise, but, as said in the citation, are words of absolute donation; that is, they transfer a present legal right to the sections designated, which becomes attached to them specifically whenever they are identified.

The defendant contends that the natural import of the granting terms is qualified and restricted by the fourth section of the act, which provides that whenever 25 miles of the road are completed in a good, substantial, and workmanlike manner, and commissioners appointed to examine the same have made a report to that effect to the president, patents shall be issued "confirming to the company the right and title to said lands situate opposite to and coterminous with the said completed section of the road." Why, it is asked, is there a necessity of such patents, if the title passed by the act itself? There are many reasons why patents should be issued upon the completion of portions of the road. They would identify the lands which are coterminous with the road completed; they would be evidence that the grantee, in the construction of that portion of the road, had fully complied with the conditions of the grant, and to that extent the grant was relieved of possibility of forfeiture for breach of its conditions; and they would obviate the necessity of any other evidence of the grantees' title to the lands embraced in them. They would thus be deeds of further assurance confirmatory of the grantees' title, and so be invaluable to them as a source of quiet and peace in their possessions. The word "confirming" is applied to such patents in section four. Words of sale and transfer, if used, would not change the character and operation of the patents. There are many instances in the reports where such effect—that is, as deeds of further assurance, or as evidence of the grantees' previous title—has been given to patents authorized or directed to be issued to parties, notwithstanding a previous legislative grant of the premises to them, or a confirmation to them of a previously existing title. The case of *Langdeau* v. *Hanes,* reported in 21 Wall. 521, is an instance of the latter kind. The supreme court there said:

"In the legislation of congress a patent has a double operation. It is a conveyance by the government, when the government has any interest to convey, but, where it is issued upon the confirmation of a claim of a previously existing title, it is documentary evidence, having the dignity of a record, of the existence of that title, or of such equities respecting the claim as justify its recognition and confirmation. The instrument is not the less efficacious as evidence of previously existing rights because it also embodies words of release or transfer from the government."

See, also, *Wright* v. *Roseberry,* 121 U. S. 488, 497, 7 Sup. Ct. Rep. 985.

The case of *Rutherford* v. *Greene's Heirs,* 2 Wheat. 196, is also instructive on this point, as well as on the character of the title conveyed. In

1782 the state of North Carolina passed an act providing "that twenty-five thousand acres of land shall be allotted for and given to Major General Nathaniel Greene," within the bounds of a tract reserved for the use of the army, to be laid off by commissioners designated in the act, as a mark of the high sense the state entertained of "the extraordinary services of that brave and gallant officer." The commissioners alloted the twenty-five thousand acres, and in 1783 caused a survey of them to be made and returned to the proper office; and the suit brought by Rutherford, who claimed, under a subsequent entry, five thousand acres of the same tract, turned upon the validity of Greene's title, and the date at which it commenced. It was contended by Rutherford's counsel that the words of the act gave nothing; that they were in the future, not in the present tense, and indicated an intention to give in future, but created no present obligation on the state, nor present interest in Gen. Greene. But the court, speaking by Chief Justice MARSHALL, answered that it thought differently; that the words were words of absolute donation, not, indeed, of any specific land, but of 25,000 acres in the territory reserved for the officers and soldiers; that, as the act of setting apart that quantity to Gen. Greene was to be performed in the future, the words directing it were necessarily in the future tense; but that nothing could be more apparent than the intention of the legislature to order the commissioners to make the allotment, and to give the land when allotted to Gen. Greene. And the court held that the general gift of 25,000 acres, lying in the reserved territory, became by the survey a particular gift of that quantity contained in the survey, and concluded an elaborate examination of the title by stating that it was the clear and unanimous opinion of the court that the act of 1782 vested a title in Gen. Greene to 25,000 acres of land, to be laid off within the bounds allotted to the officers and soldiers, and that the survey made and returned in pursuance of that act gave precision to that title and attached it to the land surveyed.

On the argument of the case it was also urged against the title of Gen. Greene, that, by the constitution of North Carolina, there should be a seal of the state, to be kept by the governor, and affixed to all grants; and that the legislative act could not amount to a grant, since it wanted a formality required by the constitution. But the court answered that the provision of the constitution was intended for the completion and authentication of an instrument attesting a title previously created by law, which instrument was merely the evidence of prior legal appropriation, and not the act of original appropriation itself. And the court said that this was so obvious that it would certainly have thought it unnecessary to advert to it, had not the argument been urged repeatedly, and with much earnestness, by counsel of the highest respectability.

While a legal title to the sections described, as distinguished from a merely equitable or an inchoate interest, passed to the railroad company by the act of July 2, 1864, it was not a title which could be disposed of by the company without the consent of congress, except as each 25-mile section of the road was completed and accepted by the president, so as.

to cut off the right of the United States to compel the application of the lands to the purposes for which they were granted, or to prevent their forfeiture in case of the company's failure to perform the conditions of the grant. The lands were granted to aid in the construction of the road and telegraph line, and, as is evident from different provisions of the act, congress designed to secure this application of them. But such application would not, of itself, operate to transfer the title; there is nothing translative of title in work performed. It would merely remove the restriction upon the use and sale of the title already granted. In that way it would not only give the grantee the right to a patent, but would render him free to sell and transfer that right to purchasers. But, in advance of the construction of the road and telegraph line, or of particular portions, the lands could not be used without the permission of congress, so as to cut off the rights of the United States mentioned above. Such permission was given when, on the thirty-first of May, 1870, by the joint resolution of the two houses, congress authorized the company to issue its bonds to aid in the construction and equipment of its road, and to secure the same by mortgage on its property and rights of property of all kinds and description, real, personal, and mixed, including its franchise as a corporation. In the property mentioned, the lands granted to the company are included. It can hardly be supposed that congress would have allowed this mortgage, if the company had no legal title to the lands which could be held as security for the moneys advanced on the bonds and transferred by sale upon foreclosure, in case default should be made in their payment. To suppose that congress would sanction such a proceeding would be to impute to it complicity in a fraud, which cannot be entertained for a moment. The conclusion follows that it allowed the execution of the mortgage, because it had transferred to the company a title to the lands covered by its grant, which could in this way be made available to raise funds for the work.

This interpretation of the granting terms of the act, as qualified by subsequent provisions, not only secures the application of the property for the construction of the road and telegraph line, but it also secures the company against its alienation by the government to other parties. The legal title to the sections having passed, the government could not grant the land to others, when no forfeiture had been previously decreed.

My attention has been called to the case of *U. S.* v. *Childers*, 8 Sawy. 171, 12 Fed, Rep. 586, in which the district judge of this district holds that the act of July 2, 1864, does not operate as a present grant to the Northern Pacific Railroad Company of the lands described, but is merely an agreement or provision that the lands shall be conveyed to it absolutely when, and as fast as, any 25-mile section of the road is constructed and accepted by the United States; and that, in the mean time, the title to the unearned and unpatented sections remains in the United States. This conclusion is founded upon the provision mentioned, that, notwithstanding the act contains words of present grant, a patent is to issue to the company for the coterminous odd sections, upon the completion of every 25-mile section of the road and its acceptance by the president;

and upon its supposed necessity to secure the application of the lands for the construction of the road, and enable the United States to apply the unearned and unpatented portion of them in case the company should fail to complete the road as rapidly as provided. The case of *Rice* v. *Railroad Co.*, 1 Black, 358, is cited in support of this conclusion, where, in an act of congress, words of present grant of land to the territory of Minnesota, to aid in the construction of a railroad, are held to be controlled by other clauses of the act. But those clauses declared that *no title should vest in the territory*, until a continuous line of 20 miles of the road was completed,—words to which no force could be given except as a limitation upon the terms of present grant, a circumstance which materially distinguishes that case from the present one. For the reasons already given, I am not able to accept the conclusion of the learned judge, who is so generally right in his decisions that one may well hesitate to dissent from his judgment.

It is not necessary to a recovery by the plaintiff that he should show that a perfect and indefeasible title to the lands granted immediately passed to the company, or anything more than a defeasible title, which would become perfect and indefeasible to coterminous lands as the road was completed. The road opposite to the premises in controversy having been completed and accepted, the title, however imperfect whilst incumbered, if it may be so termed, by the uses to which the lands were to be applied, has become perfect and indefeasible; and the costs of surveying, selecting, and conveying the lands having been paid into the treasury of the United States, the only remaining obstacle to their sale or other disposition by the company has been removed. During the construction of the road, no one could do anything to defeat the ultimate acquisition of a complete title by the company, however imperfect it may originally have been, except in one of the ways designated in the act; that is, by purchase, entry, or pre-emption, before the route of the road became definitely fixed.

The contention of the defendant against this view is that, upon failure of the company to complete the entire road within the period fixed by the act, or the supplementary act, the title to the land not then earned failed, and could be restored to the company only by affirmative action on the part of congress; in other words, that the completion of the entire road within the time designated was a condition precedent to the vesting of title to all lands not previously earned by the construction of a road coterminous with them. For this position we find no warrant in any provision of the act. The conditions attached to the grant are conditions subsequent, and not precedent. The object of the grant was to aid in the construction of the road. The title granted is therefore made to attach to the sections designated as soon as the location of the route of the road is definitely fixed, and a map thereof filed in the office of the secretary of the interior, and is not in a state of suspense until the road, or a part of it, is constructed, although not subject to be disposed of by the company, without the consent of congress, except as each 25-mile section is completed and accepted. The conditions as to the con-

struction and equipment of the road and telegraph line being subsequent, and not precedent, no one but the government, the grantor, can claim a forfeiture for breach of them.   This is but common learning.   As was said by the supreme court in *Schulenberg* v. *Harriman*, 21 Wall. 62:

"It is settled law that no one can take advantage of the non-performance of a condition subsequent annexed to an estate in fee but the grantor, or his heirs, or the successors of the grantor, if the grant proceed from an artificial person; and if they do not see fit to assert this right to enforce a forfeiture on that ground, the title remains unimpaired in the grantee.   The authorities on this point, with hardly an exception, are all one way, from the Year Books down.   And the same doctrine obtains where the grant upon condition proceeds from the government; no individual can assail the title it has conveyed on the ground that the grantee has failed to perform the conditions annexed."

The case of *Railroad Co.* v. *Traill County*, 115 U. S. 601, 6 Sup. Ct. Rep. 201, is seemingly in conflict with the views expressed as to the character of the title granted to the company.   On the fifteenth of July, 1870, in an act making appropriations for sundry civil expenses, and, among other things, for the survey of public lands within the limits of the land grant to the Northern Pacific Railroad Company, congress provided "that, before any land granted to said company by the United States shall be conveyed to any party entitled thereto under any of the acts incorporating or relating to said company, there shall first be paid into the treasury of the United States the cost of surveying, selecting, and conveying the same by the said company or party in interest."   16 St. 305, 306.   In the case cited, the supreme court had this provision before it, and in its opinion there is an expression to the effect that the legal title to the lands granted remained in the United States until their conveyance was executed, that is, until their patent was issued.   The question for judgment was, whether the lands of the company could be taxed by the county, under the laws of the territory of Dakota, before the patents issued.   The court held that they could not be thus taxed; for, if taxed, they might be sold, and the government be thus deprived of the costs incurred in surveying, selecting, and conveying the lands.   The government had, therefore, determined to withhold, until such payment, the issue of its conveyances, that is, its patents, which, as muniments of title, would, as already mentioned, be of great value to the company.   By the act as originally passed, the title granted was not disposable, as already stated, without the consent of congress, so as to cut off the rights of the United States upon breach of the conditions of the grant.   Under the reservation clause of the act, the power to amend, alter, or repeal its provisions was possessed by congress, and, before the construction of the road and telegraph line was commenced, it imposed a new condition on the disposition of the title; and that was that the company should pay the cost of surveying, selecting, and conveying the lands,—expenses incurred for its benefit,—and that the patents record evidence of the company's title, and of its absolute power to dispose of the lands, should not issue until such payment.   The law was therefore, in its effect, an assertion of a lien upon the title papers, and upon the lands, for expenses necessarily incurred for their identification and survey, and in the preparation of con-

veyances by the government; and the decision of the court was, in substance, that such lien could be made available against any taxation or sales thereunder by the territory. Notwithstanding the expression referred to, it is not believed that the court intended to hold that a legal title to the lands had not passed by the grant to the company, and thus overrule or qualify a long line of decisions, announced after the most mature consideration, and discredit the security which, only a few weeks before, congress had authorized by mortgage on the lands to raise funds to construct the road, but only to declare that the power of disposition by the grantee was stayed until the payment of the cost mentioned was made, and that the right of the government to enforce such payment could not be defeated by the tax laws of the territory. As thus construed, the decision is in harmony with other decisions of that court upon similar grants of the United States.

It remains to consider the effect of the withdrawal of the lands opposite the general route of the road, by virtue of the sixth section of the act and the direction of the secretary of the interior, upon the rights of the company. The complaint, as is seen, alleges that, at that time, the lands in controversy were public lands, not mineral, and not reserved, sold, granted, occupied by homestead or other settlers, nor otherwise disposed of or located upon, and were free from pre-emption or other claims or rights, and to them the United States had full title, not appropriated otherwise than by said act of congress, and the acts supplementary to and amendatory thereof. The act excepts from the grant such lands as are reserved, sold, granted, or otherwise appropriated at the time the line of road is definitely fixed and a plat thereof is filed in the office of the commissioner of the general land-office. The complaint makes no allegation as to the condition of the premises in controversy at that time; and hence it is contended that the complaint is defective, in not showing that the lands in controversy were then free from any town-site pre-emption or entry, the lands being within the town of Arlington, and, presumably, held under its pre-emption claim. There would be some force in this position, if the withdrawal, under the sixth section did not preclude any town-site pre-emption or entry after that date. This section declares that, after the general route of the road shall be fixed, the president shall cause the lands to be surveyed for 40 miles in width on both sides of the entire line, as fast as may be required for the construction of the road, and that the odd sections of land granted "shall not be liable to sale, or entry, or pre-emption, before or after they are surveyed, except by said company, as provided in this act." The law thus withdraws the land granted from sale, entry, or pre-emption from the time the general route is fixed; and the action of the secretary of the interior, in formally announcing that they are thus withdrawn, is giving publicity only to what the law itself declares. The object of the law and of the official withdrawal is to preserve the land unincumbered until the completion and acceptance of the road, when patents are to be issued to the company. As was said by the supreme court in a recent case, speaking of the grant now under consideration:

"Although the act does not require the officers of the land department to give notice to the local land-officers of the withdrawal of the odd sections from sale or pre-emption, it has been the practice of the department in such cases to formally withdraw them. It cannot be otherwise than the exercise of a wise precaution by the department to give such information to the local land-officers as may serve to guide aright those seeking settlements on the public lands, and thus prevent settlements and expenditures connected with them which would afterwards prove to be useless." *Buttz* v. *Railroad Co.*, 119 U. S. 55, 72, 7 Sup. Ct. Rep. 100.

The term "entry" covers a homestead and town-site entry as well as a private entry made by a settler after the close of the public sales. It is used to designate the initiatory proceeding taken for the acquisition of a portion of the lands of the United States which are open to private sale; or, as said in *Chotard* v. *Pope*, 12 Wheat. 588, "it means that act by which an individual acquires an inceptive right to a portion of the unappropriated soil of the country," by filing his claim in the appropriate local land-office.

No interest in the lands granted against the rights of the company can be acquired after such withdrawal, nor, indeed, in the absence of its announcement, after the general route is fixed. As was said in the case of *Buttz* v. *Railroad Co.*:

"The general route may be considered as fixed when its general course and direction are determined after an actual examination of the country, or from a knowledge of it, and is designated by a line on a map showing the general features of the adjacent country and the places through or by which it will pass. The officers of the land department are expected to exercise supervision over the matter so as to require good faith on the part of the company in designating the general route, and not to accept an arbitrary and capricious selection of the line, irrespective of the character of the country through which the road is to be constructed. When the general route of the road is thus fixed in good faith, and information thereof given to the land department by filing the map thereof with the commissioner of the general land-office, or the secretary of the interior, the law withdraws from sale or pre-emption the odd sections to the extent of forty miles on each side." *Wolsey* v. *Chapman*, 101 U. S. 755; *Dubuque, etc.*, v. *Des Moines, etc.*, 109 U. S. 329, 3 Sup. Ct. Rep. 188.

In the brief of counsel, argument is presented as to the lateral extent of the grant, the road passing through the territory of Washington, and, as represented, being located near the boundary line of Oregon. There is nothing in the complaint which indicates the distance between the line of the road and the premises in controversy. Its allegation is that the plaintiff derives title to them through the grant to the Northern Pacific Railroad Company, and that they are opposite to the route of the road as definitely fixed. These allegations may be taken as equivalent to direct averments that the premises are covered by the grant. But, independently of this consideration, there does not appear to be any serious question as to the lateral extent of the grant. The act of congress makes that depend upon the location of the road, whether in a territory or in a state. If in the former, the grant has twice the extent that it has when located in the latter. It is the place of location which determines this matter. The nearness of the line to any other territory or state has noth-

ing to do with it. Such, we understand, has been the uniform ruling of the land department, and that mode of determining the lateral extent of the grant is the only practicable one.

It follows from the views expressed that the demurrer to the complaint must be overruled, and the defendant required to answer; and it is so ordered.

DEADY, J., (*concurring.*) I concur in the conclusion of the learned circuit justice that, on the facts stated in the complaint, the plaintiff is the owner of the premises, and entitled to the possession thereof, for the reason that his grantor, the Northern Pacific Railway Company, at and before the date of the conveyance to him, had constructed the section of its road opposite to the premises, and the same had been accepted by the United States.

After such construction and acceptance, whether the grant to the Northern Pacific is construed as an agreement to convey the land, or a grant to take effect when and as fast as any 25 miles of the road is completed, or as a present grant of the legal title, coupled with a restraint on the power of alienation of the land, until the same is earned by construction, the legal title was in the plaintiff's grantor, and the patent to which it was entitled may be deemed to have issued.

As was said by me in *U. S. v. Ordway*, 30 Fed. Rep. 35:

"When the right to any odd section within the limits of the grant has finally vested in the corporation, by reason of the construction and acceptance of any portion of the road, the same will relate back to the time of filing the map of general route,—the initiative step in the process of complying with the act; and the patent to which the corporation is then entitled may, for all practical purposes, be deemed to have issued."

As to all the other points covered by the opinion of the court, I fully concur in both the conclusions and the reasons given in support of them.