NORTHERN PAC. R. Co. *v.* SANDERS *et al.*

(*Circuit Court, D. Montana.* April 16, 1891.)

1. LAND GRANT—NORTHERN PACIFIC RAILROAD—CONSTRUCTION.
   The provision of the Northern Pacific Railroad Company's grant of public lands, that "the president of the United States shall cause the lands to be surveyed for forty miles on both sides of the entire line of said road after the general route shall be fixed, and as fast as may be required by the construction of said railroad, and the odd sections of land hereby granted shall not be liable to sale or entry or pre-emption before or after they are surveyed, except by said company, as provided in this act," will not be construed as withdrawing the lands within the limits indicated from sale or entry until the line of the road was definitely fixed by filing a map thereof with the commissioner of the general land-office, as required by the statute.

2. SAME—PENDING CLAIMS THERETO.
   The grant to the Northern Pacific Railroad Company of certain specified lands along the line thereof whenever "the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights at the time the line of said road is definitely fixed and a plat thereof filed in the office of the commissioner of the general land-office," will not be held to include lands which had been entered as mining claims, and the applications for patents to which were pending when the plat of the road was filed, although the lands were subsequently declared to be agricultural, and the entries held invalid.

At Law. On demurrer to answer.
*F. M. Dudley,* for plaintiff.
*Adkinson & Miller* and *W. F. Sanders,* for defendants.

KNOWLES, J. The complaint in this case sets forth a cause of action in the nature of ejectment to recover the possession of section 21, in

township 10 north, range 3 west, in Lewis and Clarke county, Mont.    In it enough is set forth to show that plaintiff received from the United States a grant of 20 alternate sections of land per mile on each side of its road in Montana as definitely fixed.    This land was to be such as at the time plaintiff's road should be definitely fixed and a plat thereof filed in the office of the commissioner of the general land-office the United States had full title to, and which was not reserved, sold, granted, or otherwise appropriated, and was free from pre-emption or other claims or rights. It is set forth that the land is non-mineral, and an alternate section within the limits of said grant agricultural in character, and was on the 6th day of July, 1882, public land to which the United States had full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights.    The answer admits that the land is non-mineral; that defendants have entered upon said premises, and are now withholding the possession thereof from plaintiff; and then denies the allegations of the complaint that the said land was public land to which the United States had full title and was free from pre-emption or other claims or rights not reserved, sold, granted, or otherwise appropriated at the time the route of plaintiff's road was definitely fixed and a plat thereof filed in the office of the commissioner of the general land-office by setting up affirmatively (1) that on the 2d day of August, 1880, Theodore H. Kleinschmidt, Edward W. Knight, and six others located under the mining laws of the United States and the laws of the territory of Montana, as eight distinct mining claims, the north-east quarter of said section 21; (2) that on the 12th day of August, 1880, George P. Reeves, Helen H. Reeves, and six others located under the mining laws of the United States and the laws of the territory of Montana, as eight distinct mining claims, the north-west quarter of said section 21; (3) that on the 19th day of February, 1881, Theodore H. Kleinschmidt, Henry M. Parchen, and six others located under the mining laws of the United States and the laws of the territory of Montana, as eight separate mining claims, the south-west quarter of said section 21; (4) that on the 13th day of March, 1880, Cornelius Hedges, Thomas A. H. Hay, and six others located according to the mineral laws of the United States and the laws of the territory of Montana, as eight separate mining claims, the south-east quarter of said section 21; that each of the locators above named were citizens of the United States; that afterwards the above-named parties made application to patent said lands as mineral in the United States land-office at Helena, Mont., and for this purpose filed all the necessary affidavits and notices and proofs required in such cases; that afterwards plaintiff in this case protested against the issuing of patents to said parties on the ground that the same was non-mineral in character, and not subject to be patented as mineral land; that on account of this protest a contest was inaugurated in said land-office as to the right of said parties to a patent for said premises; that said contest existed and was pending on the 6th day of July, 1882, when the line of plaintiff's road was definitely fixed opposite to said land, and a plat thereof filed in the office of the commissioner of the general land-office.

To this answer plaintiff filed its demurrer, setting forth that the answer does not state facts sufficient to constitute a defense to the cause of action set up in the complaint. This brings up for consideration the question whether or not a mining location made according to law upon an odd section of land within the limits of the Northern Pacific Railroad Company's grant, and an application made by the locators thereof to patent such claim in the United States land-office as mineral land, and claiming the same to be such, and filing all the necessary proofs of location, mineral character, and work accompanying·such application as is required by law and the rules of the land department, and which is pending, and a contest in regard to the right of said parties to patent the same is existing in the United States land-office at the time the railroad of said company was definitely fixed, is sufficient to take such land out of such grant, although admitted now to have been non-mineral in character, and hence not subject to be located or patented as mineral land. That portion of the act making the land grant to the Northern Pacific Railroad Company, which bears upon this point, is as follows:

"There be and is hereby granted to the Northern Pacific Railroad Company, its successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph lines to the Pacific coast, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores over the route of said line of said railway, every alternate section of public land not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile on each side of said railroad line as said company may adopt through the territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through any state, and whenever on the line thereof the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from preemption or other claims or rights at the time the line of said road is definitely fixed and a plat thereof filed in the office of the commissioner of the general land-office."

It is urged by defendants that it sufficiently appears from their answer that at the time plaintiff's road was definitely fixed a claim had attached to this land which excepted it from plaintiff's grant. Plaintiff urges (1) that at the time of the location of this land as mining claims no claims could attach to this land, because the same was at that time withdrawn from settlement or sale by virtue of section 6 of the act above referred to, as within 40 miles of the general route of its road as located in 1872; (2) that, considering there was this claim, it was not a valid claim, as it is admitted it was for mineral purposes upon agricultural land. Several cases were cited by plaintiff in support of its first proposition, which I do not feel called upon to review, because I have found no railroad grants to other railroad companies which correspond in all particulars with that of plaintiff upon that point. The section of the act of congress in which is found plaintiff's grant, which it is claimed withdraws this land entirely from market after the general route of plaintiff's road was located, is as follows:

"The president of the United States shall cause the lands to be surveyed for forty miles in width on both sides of the entire line of said road after the

general route shall be fixed, and as fast as may be required by the construction of said railroad; and the odd sections of land hereby granted shall not be liable to sale or entry or pre-emption before or after they are surveyed, except by said company, as provided in this act."

The provisions corresponding to this in the act granting to the Union Pacific Railroad Company their land is found in section 7 of that act, and is as follows:

"That within two years after the passage of this act said company shall designate the general route of said road as near as may be, and shall file a map of the same in the department of the interior, whereupon the secretary of the interior shall. cause the land within fifteen miles of said designated route to be withdrawn from pre-emption, private entry, and sale; and when any portion of said route shall be finally located the secretary of the interior shall cause the said lands hereinbefore granted to be surveyed, and set off as fast as may be necessary for the purposes herein named." See 12 St. U. S. 493.

This act was so amended as to make "fifteen" in this section read "twenty." 13 Id. 358. It will be seen by an examination of this section as amended that all lands, whether odd or even numbered sections, for 20 miles on each side of the general route of said company's road, are withdrawn from pre-emption, private entry, and sale at the time of the fixing of the general route of that company's railroad, without any reference as to whether they are granted lands or not. The Central Pacific Railroad Company's grant is the same as the Union Pacific Railroad Company's, and subject to the same limitations. There is no doubt about the provisions of the Union Pacific Railroad and Central Pacific Railroad act requiring all lands, whether granted or not, to be withdrawn at the time the general route of the road is fixed within the limits of its grant. The act making the land grant to the Atlantic & Pacific Railroad Company, which is the same as the grant to the Southern Pacific Railroad Company, is also materially different from that of the act making plaintiff's grant. The section in the act making the grant is the third, and is as follows:

"That there be and is hereby granted to the Atlantic & Pacific Railroad Company, its successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific coast, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores over the route of said line of railway and its branches, every alternate section of public land not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile on each side of said railroad line as said company may adopt through the territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through any state, and whenever on the line thereof the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights, at the time the line of said road is designated by a plat thereof filed in the office of the commissioner of the general land-office." 14 St. U. S. 294.

It will be seen by a comparison of this grant with that of plaintiff's that in the former the grant takes effect when the line of the road is designated by the filing of the plat thereof in the office named; in the lat-

ter, only when the line is definitely fixed, and a plat thereof filed in the proper office. I do not see but that in the former a plat designating the general route of that road, filed in the proper office, would cause the grant to become fixed, while in the latter the definite route has to be fixed. The provision in the Atlantic & Pacific Railroad Company's grant, which is similar to that of the sixth section in plaintiff's grant, and withdraws lands along the route of that road from sale, is as follows:

"That the president of the United States shall cause the lands to be surveyed for forty miles in width on both sides of the entire line of said road after the general route shall be fixed, and as fast as may be required by the construction of said railroad, and the odd sections of land hereby granted shall not be liable to sale or entry or pre-emption before or after they are surveyed, except by said company, as provided by this act."

If I understand the case of *Railway Co.* v. *Orton*, 32 Fed. Rep. 458, the position is that the filing a plat designating even the general route of that company's road fixed the grant, and the law withdrawing the lands granted took effect. The decisions upon the construction of that grant, then, upon this point,—and certainly those that pertain to the Union and Central Pacific Railroad Companies,—do not apply in this case. They are not even analogous upon this point. Plaintiff, however, calls the attention of the court with a considerable confidence to the cases of *Buttz* v. *Railroad Co.*, 119 U. S. 55, 7 Sup. Ct. Rep. 100, and *Denny* v. *Dodson*, 13 Sawy. 68, 32 Fed. Rep. 899, upon this point. It cannot be denied that there is language in both cases which supports plaintiff's view; but in the first case, at least, the language used was not necessary to the decision of the question at issue. In the first case it appears from the statement of facts that one Peronto, under whom, I suppose, plaintiff Buttz claimed, settled upon the land in dispute on the 5th day of October, 1871, while the land was situate in the Indian country. The United States statutes prohibits any settlement upon land in the Indian country. Peronto was, then, a trespasser there. On either June 19, 1873, or June 22, 1874, the Indian title was extinguished by treaty with the United States, and Peronto was found upon the land at that time. But on the 26th day of May, 1873, some 25 days before, in any event, the Indian title was extinguished, the Northern Pacific Railroad Company filed with the commissioner of the general land-office a plat of the route of their road as definitely fixed across the country upon such a line as would include the land Peronto had settled upon within its grant. The court held that, notwithstanding this Indian title of occupancy, the grant to plaintiff took effect upon the filing of this plat. As the said Peronto or Buttz had no settlement which could be at all recognized in law, up to this time the grant of the railroad company was prior to any rights that either could claim. There could be no doubt but when that grant gained precision by the definite fixing of the route of plaintiff's road the land in controversy in that case was withdrawn from sale or homestead rights, or any other rights that could attach to the same subsequent to that definite fixing of the line of plaintiff's road—*First*, because it had

already been sold to plaintiff; and, *second,* because at that time, by vir-
tue of the provisions of section 6, it was excluded from sale or pre-emp-
tion or homestead settlement because the permanent route of the road
had been fixed. It appears, however, that the general route of the road
of plaintiff was fixed and a plat thereof filed on the 21st day of Febru-
ary, 1872, some four months after Peronto's settlement. The court pro-
ceeds to say that this act withdrew the land from the market. It had
not reached that condition when it was in the market at that time. The
statute preventing settlement upon it as within the Indian country pre-
vented it. When it had, the definite route of the road had been fixed,
and there was no function for the provisions of section 6 to perform be-
fore that time, considering that it is liable to the interpretation given it
by the court. As to the interpretation of section 6 the very eminent
jurist who delivered the opinion said:

"When the general route is thus fixed in good faith, and information there-
of given to the land department by filing a map thereof with the secretary of
the interior, the law withdraws from sale or pre-emption the odd sections to
the extent of forty miles on each side."

It will be seen here that he makes the withdrawal of the land from
sale, etc., to depend upon the filing of the map of the general route with
the secretary of the interior. The law does not authorize the filing of
any such map in plaintiff's grant. It does not say the withdrawal shall
take effect upon the filing of any such map. In the act making the
grant to the Union and Central Pacific Railway Companies there is a
provision for filing such a map, and the withdrawal of all the land
from market within the limits of the grant to these companies. The
general language of the opinion would also indicate that it was the opin-
ion of the court that section 6 of plaintiff's grant would withdraw all odd
sections of land from the market, whether mineral or not, or whether
homestead or pre-emption claims had attached to the same or not prior
to the designating this general route. That certainly was not contem-
plated. It would appear that the eminent jurist in writing that opin-
ion had in mind more the bearing of the provisions of the act making
grants to the Union Pacific and Central Pacific Railway Companies, with
which he was undoubtedly very familiar, than the act making plaintiff's
grant, for he makes no difference hardly in the provisions of these two
acts, except as to the extent of the grant, while upon this point, as I
have shown, they are very dissimilar. I think this is a proper case in
which to apply the rule expressed by Chief Justice MARSHALL as to the
authority of a decision in the case of *Cohens* v. *Virginia,* 6 Wheat. 399.
In that case, speaking for the supreme court, he said:

"It is a maxim not to be disregarded that general expressions in every opin-
ion are to be taken in connection with the case in which these opinions are
used. If they go beyond the case they may be respected, but ought not to
control the judgment in a subsequent suit when the very point is presented
for discussion."

See, also, *Barney* v. *Railroad Co.,* 117 U. S. 228–231, 6 Sup. Ct. Rep.
654. I do not believe there was any demand for a construction of sec-

tion 6 in plaintiff's grant in the case of *Buttz* v. *Railroad Co.*, in connection with the filing of a map of the general route of its road, and hence the construction made is not binding in this case. In the case of *Denny* v. *Dodson*, *supra*, the plaintiff brought an action of ejectment, and in setting up his cause of action stated facts sufficient to show the grant of the land in dispute to the Northern Pacific Railroad Company, under whom he claimed; and then undertook to set forth facts to show that the land named in that case did not come within any of the limitations specified in plaintiff's grant, such as that the same was land to which the United States had full title not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights at the time the line of the road was definitely fixed and a plat thereof filed in the office of the commissioner of the general land-office. While it may be doubted whether the plaintiff was required to allege and prove these facts, they being facts the principal purpose of which would be to negative any defense that might be presented to plaintiff's cause of action in that case, nevertheless, if required to be alleged, they should have been alleged directly, and not facts which by inference would show that this was true. It is an established maxim that material issuable facts as they exist should be alleged, and not facts from which such facts may be inferred. Pom. Rem. & Rem. Rights, §§ 517, 532; *Stringer* v. *Davis*, 30 Cal. 318. But instead of averring the facts which showed that the land was not within any exception to plaintiff's grant directly, plaintiff alleges that at the time of the establishment of the general route on the 13th day of August, 1870, the land was public land not mineral, and not reserved, sold, granted, or occupied by homestead or other settlers, or otherwise disposed of or located upon, and was free from pre-emption or other claims or rights. It seems to have been considered, if the lands were withdrawn from the market at that time, and this land was not then within any of the exceptions in plaintiff's grant, no such claim which could create such an exception could arise after that time; hence this was equivalent to an allegation that no claims creating such an exception could have existed at the time the line of the road was definitely fixed, and a plat thereof filed in the office of the commissioner of the general land-office. I submit that this result is reached only by an inference, or arises from an argument on the facts alleged; and this is not good pleading. But the eminent jurist thought this was equivalent to the other; and stated that, after the date of the establishment of the general route, it precluded any town-site, pre-emption, or entry on such land, and said: "The law thus withdraws the land granted from sale and entry or pre-emption from the time the general route is fixed." To me this decision upon this point is unsatisfactory, and this court is not precluded by it. In looking at section 6 I find no authority for the assertion that any lands were to be withdrawn from market on the sides of the general route of the road of plaintiff when established. The section does not say so. It says the lands granted shall not be liable to sale or entry or pre-emption before or after they are surveyed, except by said company. The establishing of the general route of the road could not

determine what were the lands granted. These were determined by the fixed route of the road. The section does not say they shall be withdrawn at the time of the fixing of the general route of the road. If it should be so interpreted, then we have lands withdrawn from market which are not identified, and which may be many miles outside of the 40-mile limit on each side of the general route of the road, for the fixed route of the road may be a long distance from the general route thereof. Such facts have occurred in connection with plaintiff's road in Montana. The general route of plaintiff's road as located in 1872 extended down the Gallatin river up the Jefferson and Big Hole rivers, to a point south of the Deer Lodge pass in the Rocky mountains; thence through that pass and down the Deer Lodge river to its present route at Garrison. At points in this general route upon a north and south line it was near 100 miles south of the fixed route of plaintiff's road near Helena, Mont. There are several places in Montana where the fixed route and the general route of plaintiff's road materially differ. By the terms of plaintiff's grant in section 3 lands in odd sections within 40 miles north of the fixed route of plaintiff's road near said city of Helena, are within it; they are part of the lands granted to the plaintiff, and it has asserted title to the same. Many of them were not within the 40-mile limit on each side of said general route. Yet, if the construction contended for of said section 6 is correct, these lands were withdrawn from market in 1872. Lands which have been sold by the United States upon odd sections were withdrawn because they were upon odd sections granted. It is admitted, and there can be no contention on the point in the light of judicial decisions but that the law withdrew the lands granted from the market, and they were not withdrawn by any order of the secretary of the interior. By his order lands near 150 miles south of the fixed line of plaintiff's road were sought to be withdrawn from market, although it cannot now be contended they were within the limits of plaintiff's grant, or granted to it by any construction of the law. It cannot, I think, be contended that part of the lands on the line of plaintiff's road which were granted to it were withdrawn from market by the provisions of section 6, and part not. In my judgment, if one section granted was withdrawn when the general route of the road was fixed, then all such lands were withdrawn. I think there is enough dispute about the construction of section 6 to drive us to the established rules for construing legislative grants in considering the same. Rights were given plaintiff in this section. In construing legislative grants they are to be construed against the grantee and in favor of the grantor. 3 Washb. Real Prop. (4th Ed.) 190. "The rule of construction in all such cases is now fully established to be this: That any ambiguity in terms of the contract must operate against the adventurers and in favor of the public, and the plaintiff can claim nothing that is not clearly given in the act." *Proprietors* v. *Wheeley*, 2 Barn & Adol. 793. This rule is fully approved by the supreme court in the case of *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 420. In the case of *Railroad Co.* v. *Litchfield*, 23 How. 66, the supreme court said:

"All grants of this description are construed against the grantee. Nothing passes but what is conveyed in clear and explicit language; and, as the rights here claimed are derived entirely from the act of congress, the donation stands on the same footing as a grant by the public to a private company, the terms of which must be plainly expressed in the statute, and, if not thus expressed, they cannot be implied."

To the same effect are the cases of *Rice* v. *Railroad Co.*, 1 Black, 360; *Railroad Co.* v. *U. S.*, 92 U. S. 733. The reason of this rule is thus expressed in *Gildart* v. *Gladstone*, 11 East, 675:

"The reason of this rule is obvious. Parties seeking grants for private purposes usually draw the bills making them. If they do not make the language explicit and clear to pass everything that is intended to be passed, it is their own fault; while, on the other hand, such a construction has a tendency to prevent parties from inserting ambiguous language for the purpose of taking by ingenious interpretation and insinuation that which cannot be obtained by plain and express terms."

This language was quoted and approved by the supreme court in the case of *Railroad Co.* v. *Litchfield*, *supra.* If it is said this is a law, and we must be governed by the intention of the law-making power, the answer is that in construing such a law the intention should be formed from the terms used and the subject-matter under consideration, and it should be recognized that it makes a grant of land. In the case of *Railroad Co.* v. *U. S.*, *supra*, the supreme court, in speaking of a land grant made in 1863 (the year before the plaintiff's grant) to the state of Kansas, said:

"Formerly lands which would probably be affected by a grant were, as soon as it was made, if not in advance of it, withdrawn from market. But experience proved that this practice retarded settlement of the country, and at the date of this act the rule was not to withdraw them until the road should be actually located. In this way the ordinary working of the land system was not disturbed. Private entries, pre-emption, and homestead settlements, and reservations for special uses, continued within the supposed limits of the grant the same as if it had not been made; but they ceased when the routes of the roads were definitely fixed."

We learn from this the state of mind congress was in upon this subject. The great body of the country on the proposed route of plaintiff's road at the time of the grant was Indian country, to which the Indian title of occupancy was not extinguished. But very few of the lands along this route had been surveyed. Yet most of the country was accessible. It could hardly have been contemplated that it would be 18 years after the grant was made before the fixed route of that road would be established in Montana. It was very uncertain from the nature of the country what would be the fixed route of that road. The determination of this fixed route would give precision to the grant made plaintiff, and furnish a *data* for determining what lands had been granted. Can it be supposed that congress intended, 10 years before the fixed route of plaintiff's road was established, to withdraw the lands granted to plaintiff from market, and leave it to subsequent explorations and surveys to determine what would be the lands granted? Upon such lands, during the time of these explorations and surveys, homes might be established

and cities built. But it is said they were notified what these lands were by the establishing of the general route. As I have stated before, there are lands confessedly within plaintiff's grant which were not within the 40-miles limit on the line of the general route of plaintiff's road as established in 1872, and there are lands within it which were not granted to plaintiff. There might have been much more land of that character if some of the routes said to have been examined by that company had been finally adopted. As to what were the lands granted plaintiff, and when the grant attached to specific lands, we have a guide in the case of *Railway Co.* v. *Dunmeyer*, 113 U. S. 629, 5 Sup. Ct. Rep. 566, which interpreted the third section in the Union Pacific Railroad Company's grant, which is almost identical with the same section in plaintiff's grant. See 12 St. U. S. 492. In that case, speaking through the distinguished Justice MILLER, the court said:

"The land granted by congress was from its very character and surroundings uncertain in many respects until the thing was done which should remove that uncertainty and give precision to the grant. Wherever the road might go the grant was limited originally to five sections, and by the amendment of 1864 to ten sections, on each side of it within the limits of twenty miles. These were to be odd-numbered sections, so that the even-numbered did not pass by the grant; and these odd-numbered were to be those not sold, reserved, disposed of by the United States, and to which a pre-emption or homestead right had not attached at the time the line of said road is definitely fixed. When the line was fixed,—which we have already said was by the act of filing this map of definite location in the general land-office,—then the criterion was established by which the lands to which the road had a right were to be determined. Topographically this determined which were the ten odd sections on each side of that line where the surveys had been made. This filing the map of definite location furnished also the means of determining what lands had previously to that moment been sold, reserved, or otherwise disposed of by the United States, and to which a pre-emption or homestead claim had attached, for by examining the plat of this land in the office of the register and receiver or in the general land-office it could readily have been seen if any of the odd sections within ten miles of the line had been sold or disposed of or reserved or a homestead or pre-emption claim had attached to any of them. In regard to all such sections they were not granted. The express and unequivocal language of the statute is that the odd sections not in this condition are granted. The grant is limited by its clear meaning to the other odd sections, and not these."

We have here a clear assertion that what lands are granted are only determined when the line of the road is definitely fixed. In quite a number of decisions by the supreme court it is said of such grants as the one under consideration they are in the nature of floats. When the route of the road is fixed which the law defines shall fix the grant then it takes precision, and attaches to certain specific lands. *Schulenberg* v. *Harriman*, 21 Wall. 60; *Railroad Co.* v. *U. S.*, 92 U. S. 741; *Railroad Co.* v. *Price Co.*, 133 U. S. 509, 10 Sup. Ct. Rep. 341. Can it be that congress intended to say in the act granting lands to plaintiff that, although it will not be known until plaintiff designates a fixed line for its road and files its map thereof in the office of the commissioner of the general land-office, what specific lands are granted to it, yet these lands

granted, as in this case, are to be withdrawn from market 10 years or more before it is known what they are and where situate? This construction would make the intention of congress unreasonable, which should never be maintained until there is no escape. A reasonable intent should always be presumed. The construction urged would make the statute about as unreasonable as one which doomed a man to capital punishment 10 years before he was born. Taking into consideration all these facts, and I do not think section 6 should be so construed as to withdraw any land from market until the line of plaintiff's road should be definitely fixed opposite the same, and a plat thereof filed with the commissioner of the general land-office, when the situation of such lands would be known.

But let it be admitted that the land granted was withdrawn from market at the time of the filing of the plat of the general route of plaintiff's road. Then the question arises what are the lands granted? The act does not say "every odd section within forty miles of such general route," but "public lands not sold, reserved, or otherwise appropriated, and free from pre-emption or other claims or rights, at the time the route is definitely fixed, and a plat thereof filed in the office of the commissioner of the general land-office." This brings us back to the same point as the construction contended for. The land granted must at this time be free from a claim, or it is not land granted. Hence I hold that the premises in dispute were subject to be entered upon and a claim inaugurated at any time before the definite line of plaintiff's road was fixed and the plat thereof filed in the proper office.

The next question is as to whether the claim made upon these lands would avail if not a valid claim. The premises being agricultural, no valid claim of them for mining purposes could be made. The language for consideration here in the act making the grant to plaintiff is: "Shall be free from pre-emption or other claims or rights." What, in effect, the court is asked to do in construing this clause is to insert before "claims" the word "valid," so the clause would read "free from pre-emption or other valid claims or rights." Can the court do this? In the case of *Newhall* v. *Sanger*, 92 U. S. 761, the supreme court was called upon to construe a statute of the United States in which the words "lands claimed under any foreign grant or title" occurred. The position taken in that case was that the word "lawfully" should be placed before "claimed." But the court said there is no authority to import a word into a statute in order to change its meaning. In the case of *Railroad Co.* v. *U. S.*, *supra*, the supreme court quoted with approval this language of PATTERSON, J., in *Rex* v. *Burrell*, 12 Adol. & E. 465:

"I see the necessity of not importing into statutes words which are not found there. Such a mode of interpretation only gives occasion to endless difficulty."

And then said:

"Courts have always treated the subject in the same way when asked to supply words in order to give a statute a particular meaning which it would not bear without them."

The word "valid" or "lawful," placed before "claims," would give the statute a different meaning from what it has without them. If they would not, plaintiff would not ask to have one or the other placed there. Here again the rule applies as to the construction of legislative grants. Nothing passes by such but what is conveyed in the act making the grant in clear and unambiguous terms. Such a grant must be construed most strongly against the grantee. Nothing is supplied by implication. There is another matter in this connection worthy of much consideration. If only lands which are free from valid or lawful claims at the date plaintiff fixed the definite line of its road are to be excluded from the grant, then the question is left open for consideration between plaintiff and any person who may have had a claim upon any odd section of land within its grant, the assertion of claim to which occurred since the act making the grant; for it can hardly be maintained that plaintiff would be bound by any determination as to the validity or lawfulness of a claim made by the land department which is junior to the grant to it. When the route of plaintiff's road was definitely fixed its grant to the lands received by it would relate back to the date of the act making the grant, and take effect as of that date. This, in substance, is the language of many decisions in construing similar grants. Under these conditions plaintiff could inquire into every claim which had its inception subject to the date of its grant, whether patented or not, and have it determined as to whether it was valid or not. The point as to whether a homestead claim had attached to a parcel of land within the limits of the grant to the Kansas & Pacific Railway Company was considered by the supreme court in a case where that company was plaintiff and Dunmeyer was defendant, which was cited *supra*. In that case the court said:

"It is not conceivable that congress intended to place these parties as contestants for the land, with the right in each to require proof from the other of complete performance of its obligation. Least of all is it to be supposed that it was intended to raise up in antagonism to all actual settlers on the soil when it had invited to its occupation this great corporation with an intent to defeat their claims, and to come between them and the government as to the performance of their obligations."

I do not see why this language is not as applicable to a party asserting a right to a mining claim as to one asserting a right to a homestead claim; and, if so, I might say it is inconceivable that congress intended to give to plaintiff the right to test the validity of every mining claim which existed within 40 miles of the line of its road at the time the same was definitely fixed. Under such circumstances, public policy would dictate that the terms of limitation in plaintiff's grant should not be so modified as to permit such a condition of affairs. I think the facts presented show that the assertion of title by the parties who located the ground in dispute as mineral land should be dignified with the appellation of a "claim." I would not say that every assertion of title to land would be entitled to the term "claim." Perhaps acts sufficient should accompany the assertion of title to entitle the claimant to a stand-

ing in a court of justice to contest the right to possession of the premises; but I am not called upon in this case to determine more than that facts sufficient appear to show that the parties who had located this land in dispute as mineral had a claim thereon at the time the route of plaintiff's road was definitely fixed. The fact that it was determined subsequent to the fixing of such route that this claim was invalid would not restore the premises to plaintiff's grant. It was excluded therefrom. This was fully considered in the case of *Railway Co.* v. *Dunmeyer, supra.* For these reasons the demurrer to the answer is overruled.